THE MINNESOTA THRESHER MANF'G CO. *vs.* W. H. LINCOLN.

Opinion filed December 13th, 1894.

Breach of Warranty—Motion to Direct Verdict—Specification of Grounds
—Waiver.

> The note sued on was given for the purchase price of a separator sold by the
> plaintiff to the defendants upon the following contract of sale: "The buyer
> shall have three days after it is first started to ascertain whether said machinery
> is or is not as warranted and represented. If then it is not, he shall at once
> discontinue use of it, and state full particulars wherein it fails, by letter mailed
> at once to the seller at Stillwater, Minn., and wait until seller gets a man there to
> right it. The buyer shall render the man sent necessary and friendly assistance,
> and, after he is through, shall at once give the machinery a fair trial of two
> days, and, whatever part of the machine is not as warranted or represented,
> he shall then return such part to where he got it, and the seller may either
> furnish another part, or may require the return by the buyer of the remainder
> of such machine, and then furnish another in its place, or refund what he
> received for it. If, however, the trouble arose from the improper handling of
> the machine, the buyer shall pay the costs of thus righting it. The use of all
> or part of said machinery after said two day's trial shall be conclusive evidence
> that it is as warranted and represented, and shall estop the buyer from all
> defenses, on any ground, to the payment therefor. No claims, counterclaims,
> demands, or offsets shall ever be made or maintained by the buyer on account
> of delays, imperfect construction, or any cause whatever, except as provided
> herein. The terms and conditions hereof shall not be waived, altered, or
> changed without a special written agreement signed by said thresher company
> or their specially authorized agent therefor at Stillwater, Minn." The answer
> alleged a breach of the warranty, and that the separator was worthless as a
> separator; also, set out a counterclaim for $1,000 for the value of grain wasted
> by the separator. At the close of the evidence, on motion of plaintiff's counsel,
> the District Court directed a verdict for plaintiff for the amount due on the
> note. The grounds of the motion were, in substance, that the testimony of the
> defendants showed that the defendants had by their conduct elected to waive
> any and all claims for damages, or by way of counterclaim for breach of the war-
> ranty. *Held*, that the only question which the trial court could properly consider
> in passing upon the question presented by the motion is whether the testimony
> did or did not show such waiver. The attention of the trial court and
> opposite counsel having been directed by the terms of the motion to the one
> matter of waiver, no other question will be considered in reviewing the ruling
> upon the motion. *Bank* v. *Laughlin,* 4 N. D. 391, 61 N. W. 473.

Failure to Return Machine—Directed Verdict.

> It appeared in evidence that the defendants, upon a trial thereof, found that
> the separator wasted grain, and thereupon sent a certain notice of such defect
> by mail, addressed to the plaintiff at Fargo, N. D. Pursuant to such notice,
> three several experts came to defendants' premises, one after another, claiming

to represent the plaintiff. The second expert, after working upon the machine, gave it up, and went away stating that he could not remedy the defect. The third which came, after working all night upon the separator, went away without promising or suggesting that he would return, and without curing the defect. No attempt was afterwards made by any one to remedy the defect in the machine, nor did the plaintiff ever agree to send another expert, or otherwise attempt, or agree to attempt, to fix the separator. *Held*, (conceding, without deciding, that the notice of defects sent by defendants was sufficient, and that the experts were sent by the plaintiff in response to the notice) that such evidence showed a failure on the part of the plaintiff to remedy the defect, and that under the contract, upon such failure, the defendants were bound to return the machine; and not having at any time returned the machine, as required to do, they have waived any claim arising upon a breach of said warranty. The motion upon this evidence was properly granted.

**Order Granting New Trial Reversed.**

The trial court having by its order set aside such verdict upon the ground that the motion to direct a verdict was not properly granted. *Held*, that the order setting aside the verdict and granting a new trial is erroneous.

Appeal from District Court, Cass County; *McConnell*, J.

Action by the Minnesota Thresher Manufacturing Company against W. H. Lincoln and others. A verdict for plaintiff was directed, and, from an order granting defendants a new trial, plaintiff appeals.

Reversed.

*John E. Greene*, for appellant.
*H. C. Southard*, for respondent.

WALLIN, J. The plaintiff bases this action upon defendants' promissory note for $470. Defendants answered the complaint, admitting the execution and delivery of the note, and that it was unpaid; and, further answering, allege that the note was given for the purchase price of a separator sold by plaintiff to defendants with a warranty, that there was a breach of such warranty, and that the separator was of no value whatever as a separator. Defendants' answer also embodied a counterclaim, as follows: "That on or about the 1st day of September, 1891, they bought from plaintiff the certain separator hereinbefore referred to; that plaintiff represented and warranted that said separator was as good as any separator made, and would do as good work as any;

that, relying wholly on said representations and warranty, defendants bought said machine; that defendants immediately upon commencing to thresh the grain upon their farm in Cass County, found that said machine was not as good, and would not do as good work, as other machines; that it was a poor machine, and that it wasted grain in threshing; that defendants immediately notified plaintiff of the defect, and that an expert was sent by the plaintiff to remedy the defect, but that the machine was not improved thereby; that defendants again notified plaintiff of the fact that it could not be made to work satisfactorily, and again an expert was sent out, but that said machine was not improved, and a third time an expert undertook to fix said machine; that defendants were unable to get another separator at that time, and were obliged to finish the threshing which they were engaged upon with it; that during the time defendants were obliged to use said machine, as aforesaid, it wasted wheat in excess of that which any other separator would waste, and in excess of what a good machine would waste, to the value of $1,-000.00. Wherefore defendants demand judgment (1) that said note described in said complaint be canceled; (2) that they have judgment against said plaintiff for the sum of $1,000.00, with interest from the date hereof, and the costs and disbursements of this action." Plaintiff served a reply denying the allegations of the answer set up as a counterclaim. There was a jury trial, and at the close of the testimony, upon the motion of counsel for plaintiff, the trial court directed a verdict for the plaintiff for the amount of the note, with interest. A motion for a new trial was made, chiefly upon the ground that the court erred in directing a verdict for the plaintiff. The trial court, by its order, vacated the verdict, and granted the application for a new trial, and the plaintiff appeals from such order.

The only error assigned in this court, which we shall deem it necessary to notice, is "that the court erred in granting defendants' motion for a new trial." At the trial, after introducing the note in evidence, the plaintiff rested its case, and in rebuttal put

in evidence the contract of sale embracing the warranty of the separator, the material parts of which are as follows:  "It is agreed that the only warranty or representations binding upon the seller are as follows:  (1) That said machinery is well built, and, with proper management, capable of doing well the work for which it was intended, and the engine of developing its rated power, conditional, however, that the buyer shall set up, start, and operate it in a proper and skillful manner, and without changing the original construction or any part of it.  The buyer shall have three days after it is first started to ascertain whether said machinery is or is not as warranted and represented.  If then it is not, he shall at once discontinue use of it, and state full particulars wherein it fails, by letter mailed at once to the seller at Stillwater, Minn., and wait until seller gets a man there to right it.  The buyer shall render the man sent necessary and friendly assistance, and, after he is through, shall at once give the machinery a fair trial of two days, and, whatever part of the machine is not as warranted or represented, he shall then return such part where he got it, and the seller may either furnish another part, or may require the return by the buyer of the remainder of such machine, and then furnish another in its place, or refund what he received for it.  If, however, the trouble arose from the improper handling of the machine, the buyer shall pay the costs of thus righting it.  The use of all or part of said machinery after said two day's trial shall be conclusive evidence that it is as warranted and represented and shall estop the buyer from all defenses, on any ground, to the payment therefor.  No claims, counterclaims, demands, or offsets shall ever be made or maintained by the buyer on account of delays, imperfect construction, or any cause whatever, except as provided herein.  The terms and conditions hereof shall not be waived, altered, or changed without a special written agreement signed by said thresher company or their specially authorized agent therefor at Stillwater, Minn."  It further appeared from plaintiff's testimony that the machine was sold through the firm of Hughes & Williams,

which firm was plaintiff's local agent at Fargo; also, that Williams was the general agent of plaintiff for the State of North Dakota. The undisputed testimony offered by the defendants shows the following state of facts: The separator was delivered to defendants, who were partners largely engaged in wheat raising, in August, 1891, and was never returned to the plaintiff or its agents. In the first season the separator was used in threshing all of the defendants' crop, aggregating some 35,000 bushels of wheat and 7,000 bushels of oats and barley.

In support of defendants' counterclaim, W. H. Lincoln, one of the defendants, testified as follows: "We had not threshed over half a day before the machine gave us trouble. We notified the company at Fargo that the machine was not giving satisfaction, and to send out a man to fix it. This was after we had used it half a day. They sent out an expert. The difficulty of the machine of which we notified the company was, it was carrying the grain over into the straw, and not cleaning it properly. I told the agent who came out to fix it what the trouble was. We were threshing at the time he arrived, and he saw the machine work. I stopped the machine, and he looked it over, and said he could not fix it, because he did not have the material to fix it. He admitted that it needed fixing, but he did nothing to it. He said that he was going to Fargo, that night, and would send a man right out. They did send a man within two or three days. He took his tools, and went into the machine, and tried to fix it, but gave it up as a bad job. He said, 'I cannot fix it.' I understood the man to mean he could not stop the machine from throwing grain over into the straw. I simply understood that he himself could not fix it, and make it do good work. I didn't know the agent's name who came out there. He was a man sent out there, as I supposed, to repair and look after machines at work in the field. It was not any one with whom we had a contract or any other understanding or agreement for the purchase of the machine. Q. What did you say to the agent upon his notifying you that he came there to fix the machine? A. I told him that

we would not use the machine any more, and we got ready to throw off the belt. He said that we could go ahead and use the machine, and that he would try and fix it. He said, 'If we cannot fix it, we will furnish you another, and make it right.' I had a talk with Mr. Hughes after the second man was out there, at his office in Fargo; going to Fargo same night expert was there. I told him that his man had been out there and tried to fix the machine, and gave it up. I told him we could never accept the machine in that condition. Mr. Hughes said that he could fix the machine. I explained to him that it was wasting grain, and he said it could be fixed. A third expert was sent out after this talk with Mr. Hughes, and I supposed it was by his orders, or the orders of the house at Fargo. We continued to use the machine because there was no other in the market to be had at any price. I tried to buy a separator that day in Fargo. Hughes & Williams did not have any, so they said. The last expert that came out pretended to work on the machine the biggest part of one night, but I was never able to see that they made any change. When the last mam came, we had threshed a section and a half of grain, and still had a section and a half to thresh. Q. You said that the machine wasted grain. Please state how much grain the machine wasted, if you know. A. Why, I think the machine wasted 25 bushels of grain every time we threshed a half day on the place; that is, at each setting. We usually made two settings of the machine a day. We had used the machine two or three days when the first expert came. It was from two to four days after that the second expert came, and I think, then, two days later, the last man was sent out. After I saw Mr. Hughes, it was ten days, and perhaps more, that we were using the machine before the last man came out. After he came, we tried to get another machine, but were not able to do so. It took us something over thirty-five days to do our threshing that year. We had used this machine about half a day when we discovered that it did not separate the grain properly. We then notified the company by mail. We sent in notice to Fargo to the Minnesota

Chief Company.   We had used the machine two or three days before the expert arrived at the farm.   He got there two or three days after we sent the notice.   We operated it until he got there, and it was in operation when he arrived.   The only defect of which we complained was that it wasted the grain, and did not properly clean it.   It is possible to change any machine so as to throw the grain over the sieves, but I do not know as it is possible to change any separator so as to carry grain over into the straw. To the best of my recollection, the second expert came within four days after the first one had gone.   During all that time we had used the machine the best we could.   From the time we started up the machine until the second expert came, nobody could have made us believe but what the machine was all right and could be fixed, and I supposed that the man that had been sent out there was not competent, or something of that kind.   I supposed it would be fixed just as soon as they could do it, and we used the machine with that idea.   At the time I saw Mr. Hughes in Fargo, we had been using the machine in the neighborhood of a week or ten days.   After the second expert came, and said he could not fix it, I lost faith in the machine.   We continued to use it because there was nothing else that I could get, and I had to get the crop threshed.   At the time I talked with Mr. Hughes, he said that he would send somebody out from that office.   Experts came.   They tried to fix the machine, but failed to do so.   We continued to use it, and threshed our entire crop with that machine in 1891.   We did not return the machine or any part of it, to Fargo, nor to Gardner.   I, myself made the bargain for the purchase of this machine, and am a member of the partnership that transacted the business.   As to the estimate of the amount of grain that was wasted by this machine, anything of that kind has to be guesswork.   I did not make any calculation based upon any examination, or anything of that kind, of the chaff that falls from the machine."   E. H. Lincoln testified:   "I was present at the farm where this machine was working during the threshing season.   I was there when the experts testified to

by W. H. Lincoln came out there, and heard and took part in the conversation between W. H. Lincoln and the expert that was there the second time, when he came, and reported that he came there for the Chief Company to fix the machine. We stopped the machine, and he tried to fix it. We started and stopped several times, and he finally made up his mind that he could not fix it. He said that it was beyond him,—that he could not remedy the machine. Then we made up our minds that we would not use the machine any more, and threw off the belt, and stopped, This expert then said, 'you had better go on and use it, and perhaps someone else can fix it.' He said that the company would do all that was right about the machine, and either fix it so that we could make that machine work, or give us a new one that would work. We went on and used it. That night my brother went to Fargo to see if the Minnesota Chief folks could furnish us with another machine, and, if not, to buy another machine of another kind. I had one talk with Mr. Hughes some time during the threshing season, and I think it was after the last expert had been out to the farm. I told him that the machine was not doing what it ought to; that it was a failure, in my estimation; and Mr. Hughes said that the machine could be fixed properly; he was sure it could be fixed; that the company would do what was right with the machine; and that, if they could not fix it, they would furnish us with another machine." Other witnesses testified that the separator wasted grain, but no testimony was offered of the aggregate of the grain wasted, or of the value of the whole or part of the wasted grain.

At the close of the testimony, the plaintiff, by its counsel, moved the court as follows: "The plaintiff, by its counsel, at this time requests the court to instruct the jury to find a verdict for the plaintiff for the amount claimed in the complaint, on the ground that the evidence failed to show a defense to the cause of action set forth in the complaint; that the evidence shows that the plaintiff fulfilled, upon its part, the conditions of the contract

for the sale and warranty of the machine in question; and that the defendants, by their own testimony, have established a waiver of all claims for damages or other defense arising from any breach of the warranty,—which request and motion was granted by the court, and the defendants duly except."

We think the terms of the motion were sufficiently explicit under the rule requiring the grounds of such motions to be specified. The language of the motion, fairly construed, directed the attention of the court and opposite counsel, not only to the "contract for sale and warranty" in evidence. It further asserts that "the defendants by their own testimony, have established a waiver of all claims for damages or other defense arising from any breach of the warranty." To decide the motion with reference to the grounds stated, it was necessary that the trial court should explore the testimony offered by the defendants, and to consider such testimony in connection with the written contract of sale and warranty, in order to ascertain whether or not it was true, as claimed in the motion, that such testimony showed a waiver of all claims for damages or other defense arising from any breach of the warranty. The testimony, not being contradicted, did show a breach of the warranty; but the difficult question remained, whether defendants had shown by testimony that they had waived "all claims for damages" arising from such breach. To determine this question it was necessary to carefully examine the writing which contained the agreement between the parties. We have already quoted the contract of warranty, and, when analyzed, it appears that it imposed upon the parties certain reciprocal duties and obligations. It declared: "That the buyer shall have three days after it is first started to ascertain whether said machinery is or is not as warranted and represented. If then it is not, he shall at once discontinue use of it, and state full particulars wherein it fails, by letter mailed at once to the seller at Stillwater, Minnesota, and wait until seller gets a man there to right it." It is noticeable that this agreement, unlike many machine contracts which had been drawn into litigation, nowhere

required the buyer to give any notice to the agent making the sale. The only duty as to the notice resting upon the buyer was to "state full particulars wherein it fails, by letter mailed at once to the seller at Stillwater, Minnesota." To sustain the counterclaim, the defendants had the burden of showing that the required notice had been given by them to the seller at Stillwater, Minn. No such notice was shown or claimed to have been sent. The testimony as to notice is this: "We then notified the company by mail. We sent in notice to Fargo to the Minnesota Chief Company." Liberally construed, this testimony might imply that some kind of notice, the nature of which does not appear, was mailed, addressed to plaintiff at Fargo, N. D. Standing without support, this testimony certainly fails to show such notice as the agreement required; and failing to give the notice stipulated for would without doubt, unless waived by the seller, operate under the contract to defeat any claim for damages arising from a breach of the warranty of the separator. *Fahey* v. *Machine Co.*, (N. D.) 55 N. W. 580.

Counsel for defendants contend that the stipulation requiring notice to the seller to be sent to Stillwater, Minn., has been waived. No express waiver is claimed to have been made, but it is urged that the facts disclosed by the evidence show a constructive waiver of notice by the plaintiff. The testimony shows that, within two days after the notice was mailed to Fargo, an expert appeared at defendants' premises, claiming to represent the plaintiff, and examined the machime, but did not attempt to remedy the trouble; that the expert went away, and, within a day or two, a second expert came and attempted to repair the machine, but failed to do so, and a third came, and made an unsuccessful attempt to put the separator into working order. The last expert, it appeared, came in response to an oral request made to a member of the local agency at Fargo by one of the defendants. The fact that the experts came in response to the notice sent to Fargo, and attempted to remedy the defect in the separator, is relied upon as a waiver of the requirement as to notice; and, the

requirement being made for the benefit of the sellers, it is argued that it had a right to waive it, and that sending the experts showed that the notice had been received by the plaintiff at Still-water, and had been acted upon by the controlling officers or agents of the seller, whose headquarters are at Stillwater, Minn. The reasoning is plausible, but the fact cannot be ignored that the defendant had the burden of showing, no notice having been sent to Stillwater, that the notice which was sent to Fargo was a proper notice, and that it was in fact received and acted upon at headquarters by the seller. The fact that certain persons claim-ing to be experts came in response to the notice sent to Fargo certainly does not show conclusively that they were selected for this particular work upon orders emanating from Stillwater, nor does it appear that such experts as were sent to fix the separator were not sent by the local agents without the knowledge of those in charge of the plaintiff's business at Stillwater. In fact, the evidence upon this point tends strongly to show that the local agents, upon the request of the defendants to do so, sent the experts themselves. Whether the agents did or did not consult with the officials at Stillwater before sending out the experts, or at any time, does not appear, nor is there any evidence bearing upon this point in the case. The stipulation requiring notice, stating "full particulars" wherein the machine fails to do good work, to be sent to the managing office of the company, is plainly written in the contract, and no suggestion is made that the parties had the legal right to enter into such stipulation. The requirement of notice is, in our opinion, not only valid in law, but for reasons pointed out in *Fahey* v. *Machine Co.*, *supra*, is one which is just and reasonable in itself.

The case cited is pressed upon our attention as being decisive of this case, and it is claimed that under the authority of that case we should hold that the defendants here must fail because in this case, as that cited, no notice was in fact sent to the headquarters office. But the cases are not parallel in their facts. In the case cited, the company introduced affirmative testimony, which was

not disputed, tending to show that the required notice was never in fact received or acted upon at the headquarters office, and that nothing was known, at the center of authority, of the failure of the machine, until many months had elapsed after the sale. In the case at bar the plaintiff has offered no such evidence, and we are unable to ascertain definitely from the evidence whether the experts which attempted to remedy the fault in the separator were sent by the plaintiff or by the local agency. If the local agents, without authority to do so, and without the knowledge or approval of the managing office, sent out certain experts of their own selection to fix the machine, we are quite clear that such action could not be construed as a waiver of the stipulation as to giving notice. What was said by this court in *Fahey* v. *Machine Co.*, was said after due deliberation, and was adhered to upon reargument, and we have no desire to modify the views expressed in that opinion. At the same time, we have no intention of expanding the doctrine of that case to cover cases arising upon other and dissimilar facts. It happens to be true, in the case under consideration, that the point of nonnotice was not decisive of the motion to direct a verdict. In our opinion, the action of the court below in directing the verdict was proper, without regard to the question of notice; and hence we shall not rule this case upon that point, but shall simply say that we are inclined to the view that under an established rule of practice requiring the court, upon motions of this character, to give the adverse side the benefit of all reasonable and fair inferences which can be drawn from the evidence, it would have been proper to have denied the motion, had it rested upon the point of nonnotice alone, and submitted the question of fact to the jury as to whether the notice mailed to Fargo had been received and acted upon at the office of the general management at Stillwater.

But the grounds of the motion were an alleged waiver on defendants' part of all claims arising upon a breach of warranty; and proceeding now upon the assumption that a proper notice was sent to and received at the Stillwater office, and that the

experts were those of plaintiff's own selection, we are required to look further into the evidence to ascertain whether the record discloses a waiver. Reverting to the contract, we learn that, after the "man" (in this case "man" is to be construed as in the plural number) sent to repair the machine "is through," the contract provides that the buyer "shall at once give the machine a fair trial of two days, and, whatever part of the machine is not as warranted or represented, he shall then return such part to where he got it, and the seller may either furnish another part, or may require the return by the buyer of the remainder of such machine, and then furnish another in its place, or refund what he received for it. * * * The use of all parts of said machinery after said two days' trial shall be conclusive evidence that it is as warranted and represented, and shall estop the buyer from all defenses, on any ground, to the payment therefor. No claims, counterclaims, demands, or offsets shall ever be made or maintained by the buyer on account of delays, imperfect construction, or any cause whatever, except as provided herein." The meaning of this provision is plain and unambiguous. By the agreement, defendants saw fit to substitute, for any common-law damages to which they might be entitled, arising from any breach of warranty, the right or privilege of returning the machine if the plaintiff, after notice of defects, failed to put the machine in order, and make it work as warranted. But the defendants were limited to the period of two days' use of the machine after the man or men sent to repair the machine got through or completed their work of repairing the machine. The evidence is undisputed that two experts attempted to fix the machine. The last one worked all night, and went away without agreeing to return or promising to have another one sent. None of the experts succeeded in remedying the defect. Upon this point the witness W. H. Lincoln testified: "The last expert that came out pretended to work on the machine the biggest part of one night, but I was never able to see that they made any change. When the last man came, we had threshed a section and a half of grain, and

still had a section and a half to thresh." On cross-examination this witness said: "Experts came. They tried to fix the machine, but failed to do so. We continued to use it, and threshed our entire crop with the machine in 1891. We did not return the machine, or any part of it, to Fargo nor to Gardner." From this evidence it appears that, after the notice of defects was sent (assuming that a proper notice was sent,) the plaintiff sent experts to cure the defect in the separator; that, after repeated endeavors to correct the trouble, the experts wholly failed to do so, and one and all disappeared without promising to return; and that, after the last expert went away, defendants continued to use the separator for a period of more than two days, and in fact threshed a section and one-half of grain with the separator after the experts departed from defendants premises in the year 1891. So far as appears, the defendants are still in possession of the separator. This witness further testified: "We continued to use it because there was nothing else that I could get, and I had to get the crop threshed." After a careful consideration of this evidence in connection with all the evidence in the case, we are forced to the conclusion that the defendants intentionally and deliberately chose not to return the machine, but to keep it despite its defects. The result of this course was necessarily, under the terms of the contract, to waive any money damages which may have accrued from a breach of the warranty.

The evidence discloses that the position of the defendants when the experts ceased their efforts without repairing the defect was extremely difficult, and one which presented an embarrassing alternative. It appears that defendants were convinced, after the second expert went away without having benefitted the machine, that the separator was incurably wasteful; and, having reached this conclusion, they determined to purchase another machine, and one of them went to Fargo for that purpose, but found that no other could be had, because at that time none were in the market. In this dilemma defendants were forced to allow the remainder of their large crop to go unthreshed and be lost, or, on the other

hand, to utilize the separator in their possession, which it appears did satisfactory work, with the drawback of wasting a portion of the grain. As has been seen, the defendants made their election, and preferred, under the circumstances, to keep the machine they had, rather than allow their crop to perish. But this election, under the terms of the sale contract, operates as a waiver of money damages arising from any breach of the contract of warranty. The defendants' position was certainly embarrassing; but it was one which they had invited by entering into the contract of sale. The courts, under such circumstances, are powerless to mitigate the hardship incident to the case, as their duty is confined to the exposition and enforcement of agreements. The courts cannot, as seems to be contended by counsel, annul or construe away an agreement otherwise legal, on the sole ground that in its enforcement it operates harshly in a given case which is presented for judicial determination.

But our attention is directed to the following testimony of the witness Lincoln: "I had one talk with Mr. Hughes some time during the threshing season, and I think it was after the last expert had been out to the farm. I told him that the machine was not doing what it ought to; that it was a failure, in my estimation; and Mr. Hughes said that the machine could be fixed properly; he was sure it could be fixed; that the company would do what was right with the machine; and that, if they could not fix it, they would furnish us with another machine." The claim is made that this talk of the local agent so operated upon the written contract as to extend the stipulated time fixed by contract for the return of the machine, and in its effect gave defendants leave to retain the machine for an indefinite period, and until they were further notified, or informed that the company could not fix the machine. We cannot so construe the conversation. Mr. Hughes gave his individual opinion to the effect that the separator could be fixed, and that the company would fix it. But it nowhere appears that Mr. Hughes was an expert, or had special skill in repairing machines; nor did he assume to say

when the company would repair the machine. He had not been selected by the plaintiff, and sent out as an expert to repair this machine, nor was he commissioned to give an opinion as to whether or not the trouble with this machine was remediable. On the contrary, the plaintiff expressly and in writing reserves the right to itself to say, after sending out experts of its own selection, whether or not they would continue their efforts to repair, or whether they would cease their efforts, and take back the separator, if tendered within the time limited in the agreement. We have seen the true reason why the defendants chose not to return the machine, and there is no testimony which even suggests that defendants were deterred or persuaded from returning the machine by anything said or done by Hughes, or any one else. But the contract clearly shows that the local agent was powerless in the premises, and had no authority whatever to enter into any agreements with the defendants to extend time or otherwise alter the terms stated in the writing. The writing closes with the following sentence: ."The terms and conditions hereof shall not be waived, altered, or changed without a special written agreement signed by said thresher company or their specially authorized agent therefor at Stillwater, Minnesota.". There is no pretense that the local agent was specially authorized to alter the agreement or to extend time or performance under it. This feature of the contract, like its other parts, was binding upon the parties. *Reeves* v. *Corrigan*, 3 N. D. 415, 57 N. W. 80. Our conclusion is that the evidence introduced by the defendants fully justified the trial court in granting a motion to direct a verdict on the grounds stated in the motion.

In conclusion, it should perhaps be explained that this opinion is written after full argument upon a rehearing. Our conclusions as to the disposition of the case proper to be made have not been at all changed by the reargument, but, on the contrary, have been much strengthened. In the former argument our attention was not especially drawn to the grounds of plaintiff's motion to direct a verdict, and accordingly, upon the first argument, we did

not observe the fact that the grounds embraced in the motion did not cover the question of damages, or any question except that of a waiver. In the former decision we reviewed the whole evidence, and concluded that it wholly failed to sustain either the defense or the counterclaim pleaded in the answer, and accordingly held, as we now hold, upon another ground, that the motion was properly disposed of; but we are, upon consideration, forced to the conclusion that the question upon the motion, both in the trial court and in reviewing the case in this court, must turn upon the grounds stated in the motion, and upon no other. See *Bank* v. *Laughlin*, (decided at this term) 61 N. W. 473, 4 N. D. 391, and *Mattoon* v. *Railroad Co.*, (S. D.) 60 N. W. 740. Finding no error in directing a verdict for the plaintiff, the order setting aside such verdict, and granting a new trial, must be reversed, and judgment entered for the plaintiff upon the verdict. All concur.